LEWIS v. WEIDENFELLER.

1. LIBEL AND SLANDER—ACTIONABLE WORDS—SPECIAL DAMAGES—
PLEADING—DEMURRER.
On demurrer to a declaration charging that defendant
falsely stated that plaintiff, an attorney at law, who was
a candidate for nomination as legislative representative,
had dropped out of the race in favor of defendant and had
solicited the payment of $200 to withdraw and support
defendant, the declaration was sufficient without allega-
tions of special damages; the language alleged conduct
of a disreputable and corrupt, if not criminal, nature, and
is actionable per se.

2. SAME—DECLARATION.
The test by which to determine whether special damages
must be alleged and proved is whether the language
necessarily must, or naturally and presumably will, occa-
sion pecuniary injury to the plaintiff.

Certiorari to Van Buren; Des Voignes, J. Sub-
mitted January 29, 1913. (Docket No. 70.) Decided
May 28, 1913.

Case by Lynn J. Lewis against Charles A. Weiden-
feller for slander. An order overruling a demurrer
to the declaration is reviewed by defendant on writ
of certiorari. Affirmed.

Clyde W. Ketcham, for appellant.

T. J. Cavanaugh and Glenn E. Warner, for appellee.

MOORE, J. The plaintiff commenced this suit by
summons. Later a declaration was filed. The defend-
ant demurred to the declaration. The demurrer was
overruled. This proceeding is brought to review the
action of the circuit judge in overruling the demurrer.

The declaration is a very long one. It states in sub-

stance that the parties were candidates for the nomination as members of the legislature on the republican ticket, in the Van Buren county district at the August primaries. It avers that plaintiff is an attorney at law residing in Bangor, and has been engaged in such profession for a number of years last past.

We quote portions of the declaration as follows:

"Heretofore, to wit, on the 27th day of August, A. D. 1912, in the county aforesaid, and in the legislative district aforesaid, the said defendant being on a train running from South Haven to Kalamazoo, stepped off the train at the village of Grand Junction at about 7:20 a. m. and said to William H. Crouse in the presence and hearing of numerous electors 'Lewis (the plaintiff meaning) dropped out of the race last night at 8 o'clock' ('meaning that the said plaintiff who was a candidate for member of the legislature on the republican ticket in opposition to him, the said Weidenfeller, had withdrawn and was no longer a candidate and intending thereby to influence electors to vote against the said plaintiff because of his said withdrawal). And on the day aforesaid, in the county aforesaid, at the village of Lacota, between the hours of 7 and 8 o'clock a. m., the said Charles A. Weidenfeller stepped from the train at the village of Lacota and spoke to Carl Gibson, in the presence and hearing of numerous electors of the township of Geneva, as follows, to wit: 'Tell the man over to the barn to hitch up and go to Jack Buckley's and Charlie King's and tell them that Lewis (the plaintiff meaning) has dropped out of the race in my favor' (intending thereby to have the man at the barn, to wit, Frank Galbreath, drive to Jack Buckley's and Charlie King's, two republican electors of the township of Geneva who were advocating plaintiff's nomination and who were going to work for plaintiff during the day, and inform them that the plaintiff had withdrawn from the race and that the plaintiff's influence would be given over to him, the defendant, and intending thereby to have the said Jack Buckley and Charlie King understand and believe that the plaintiff was out of the race and that it was plaintiff's wish and desire that the said Jack Buckley and Charlie King

should go out and work for the said defendant, Weidenfeller, and intending by the statement aforesaid to influence electors of the township of Geneva to vote for him, the said Weidenfeller, because of the fact that the plaintiff had withdrawn as stated by the said Weidenfeller). And on the day aforesaid in the county aforesaid, the said defendant, Charles Weidenfeller, in the morning, while riding on the Michigan Central train from Lacota to Grand Junction, spoke of and concerning the plaintiff in a certain discourse with Whitfield Ackley the following false, malicious, wicked, and slanderous words, to wit: 'Lewis (the plaintiff meaning) has pulled out of the race in my favor' (meaning that the plaintiff had withdrawn his name as a candidate for member of the legislature and as a part of said withdrawal had announced himself as in favor of the candidacy of the said defendant, Charles A. Weidenfeller). 'He (the said plaintiff meaning) wanted me (the defendant meaning) to pay him (the plaintiff meaning) two hundred dollars, but I (the defendant meaning) could not see it that way. He (the plaintiff meaning) finally dropped out altogether' (intending thereby to have it understood by the electors of the county of Van Buren that the plaintiff had withdrawn from the race and was no longer a candidate for the office, and that it was plaintiff's wish and desire that the persons who supported him thus far should turn to the candidacy of the said defendant, Weidenfeller), etc. * * * Said of and concerning the plaintiff in a certain discourse which he was having with William J. Barnard in the village of Bloomingdale on said 27th day of August, A. D. 1912, in the presence of divers good and worthy citizens, and of and concerning the false, wicked, injurious, and malicious statements made, published, and circulated of and concerning the plaintiff in the several counts of this declaration hereinbefore set forth, in words as follows: 'The little stunt I pulled off in South Haven and Lacota worked all right, but Lewis (the plaintiff meaning) caught on to it. I didn't have to use a telephone—just dropped off the train and tipped it off. I did not think then what the result would be.' Meaning and intending to aver and charge that he pulled off a little stunt, to wit, circulated in and about Lacota and South Haven the story

that the plaintiff, who was then a candidate in op-
position to him, the defendant, etc.   *   *   *   That
to further injure the said plaintiff in his good name,
fame, and reputation and in his profession as an at-
torney and counselor at law, the said defendant on
the 30th day of August, A. D. 1912, in the village of
Paw Paw in a certain discourse which he was then
having and a statement which he was then making
with, to, and in the presence of Charles E. Ashley,
Warren H. Goss, and divers other good and worthy
citizens of Van Buren county, did publish and circu-
late of and concerning said plaintiff and of and con-
cerning the article appearing in said Bangor Advance
in connection with said plaintiff the following false,
injurious, malicious, wicked, and defamatory words,
to wit:   'Mr. Lewis (the plaintiff meaning) called me
(the defendant meaning) up from South Haven, and
I (the defendant meaning) met him (the plaintiff
meaning) in Bangor.   Lewis (the plaintiff meaning)
offered to take $200 to lay down (to withdraw mean-
ing) as a candidate for the nomination and throw his
support to me (meaning that the plaintiff would vote
for the defendant and get his supporters to vote for
the defendant if the defendant would pay him, the
plaintiff, $200).   I (the defendant meaning) said I
(the defendant meaning) would not give a cent.   I
(the defendant meaning) have two witnesses to prove
that Lewis (the plaintiff meaning) offered to take
$200.   I (the defendant meaning) am going to make
them retract what was said in the Bangor paper or
start proceedings.'   Intending thereby to charge the
said plaintiff with having offered to vote for the said
defendant and to give him, the defendant, the support
of plaintiff's adherents for the sum of $200, and to
charge him, the said plaintiff, with having committed
a crime, with having violated the primary election
law, and with having offered to sell his vote and the
votes of his friends and adherents and supporters to
the said Weidenfeller for two hundred dollars," etc,

The claim of defendant is stated by counsel as fol-
lows:

"The primary statute does not cover and was not
aimed to reach the situation complained of, assuming
for the purposes of the demurrer that all the words

alleged to have been spoken were true. The precise question involved has never been before the courts, and there are no decisions in point; but the language and tenor and purposes of the act clearly negative the application sought to be given by the plaintiff. The act is directed to the question of prohibiting efforts, by the use of money or otherwise, to 'induce any person to vote or to refrain from voting in a particular manner at such primary election.' It being the clearly expressed purpose to 'prohibit the prevailing practice of candidates hiring with money and promises of positions, etc., workers on primary day and prior thereto,' and the inducing of voters to vote or refrain from voting in a certain manner. (Sec. 45, Amendment 1911, Act 279.) * * * Unless the words alleged to have been spoken by the defendant charge the commission of a criminal offense, for which the plaintiff could be imprisoned, the words are not actionable *per se*. Under the law a candidate for the nomination for office has the right to withdraw at any time; and there is no inhibition in the statute against an arrangement with another candidate, whom it may be he desires to support, whereby he will be paid a sum sufficient to reimburse him for his expenses and outlay during the campaign; and a suggestion looking to this end from one candidate to another is not within the misdemeanor clause of the primary law; neither is it such a charge as holds the plaintiff up to ridicule in his community or charges him with 'being a knave or trickster'; neither is it such a charge as brings the plaintiff 'into infamy, scandal, and disgrace,' as set forth in the various innuendoes of the declaration. In no sense are the words actionable *per se*. Therefore the demurrer should be sustained."

To this the plaintiff replies:

"It is said that the declaration does not state a cause of action, because the words set forth are not actionable *per se*, and no special damages are pleaded. In order to pass upon this question, we must consider the alleged slanderous words with reference to Act 281 of the Session Laws of 1909, being what is commonly called the primary election law, and section 11449 of Miller's Compiled Laws, entitled 'An act to maintain

political purity.' The purpose of the acts must be considered as well as the intent with which they were adopted by the legislature. * * * Reading those portions of the act which we insist apply to the facts alleged, we have the following:

" 'Every person who directly or indirectly by himself * * * endeavors to procure any money or valuable consideration * * * for any voter or to or for any person on behalf of any voter * * * or to or for any person in order to induce or have such person induce any voter to vote for or refrain from voting for, or support or oppose any candidate, * * * shall be deemed guilty of a misdemeanor,' etc.

"Does this language apply to the conduct imputed to the plaintiff? Did the plaintiff endeavor to procure from the defendant any money for any voter? It is charged that he endeavored to procure of the defendant $200, and for this sum he would lay down, withdraw, not be a candidate, deliver the goods to the defendant, throw his support to the defendant."

The argument continues that it is charged that the plaintiff attempted to procure, contrary to the terms of the statute, money from defendant.

"Again, section 11449 of Miller's Compiled Laws, being section 3 of an act entitled 'An act to maintain political purity,' provides that the following persons shall be deemed guilty of bribery:

" 'First. Every voter who shall, before or during any election, directly or indirectly, by himself or by any other person on his behalf, ask, solicit, receive, agree or contract for any money, * * * for himself * * * for voting or agreeing to vote, etc. * * *'

"Again, in keeping with the above provision in the purity of elections act, section 49 of the primary act provides:

" 'It shall be unlawful for any person to solicit from any candidate for nomination for any office included in the provisions hereof, any money or other property.'

"The defendant charged and circulated about the community that the plaintiff offered to withdraw as a candidate and to throw his strength and support

to the defendant who was one of the opposing candidates, and to deliver the 'goods' for $200. This looks to us like soliciting money and would be bribery if brought within the purity of elections act, and, under section 52 of the primary law of 1909, would be a misdemeanor, punishable by a fine of $500 or six months' imprisonment, if found to be a violation of section 49. * * * We contend, then, that the words spoken of and concerning the plaintiff were actionable, *per se,* whether there was a direct violation of the acts aforesaid or not. *Smith* v. *Smith,* 73 Mich. 445 [41 N. W. 499, 3 L. R. A. 52, 16 Am. St. Rep. 594]; *Orband* v. *Telegraph Co.,* 170 Mich. 387 [136 N. W. 380]. By demurring the defendant admits the allegations of the declaration, admits the circulation of the slanders therein charged against him, and whether they will bear the construction placed upon them by the plaintiff is for the jury. 'The truth of the innuendoes,' as was said in the *Orband Case, supra,* 'is also for the jury.' Newell on Slander and Libel (2d Ed.) 628."

Without undertaking to determine whether a crime was charged within the meaning of the statutes above cited, we have no hesitancy in concluding that what was stated was well calculated to injure plaintiff in his profession and also as a candidate for the office which he sought. In addition to the above authorities, see *Haney Manfg. Co.* v. *Perkins,* 78 Mich. 1 (43 N. W. 1073); *Mains* v. *Whiting,* 87 Mich. 172 (49 N. W. 559); *Belknap* v. *Ball,* 83 Mich. 583 (47 N. W. 674, 11 L. R. A. 72, 21 Am. St. Rep. 622); *Oliver* v. *Perkins,* 92 Mich. 304 (52 N. W. 609); *Henkel* v. *Schaub,* 94 Mich. 542 (54 N. W. 293); *Wheaton* v. *Beecher,* 66 Mich. 307 (33 N. W. 503).

The judgment is affirmed, and defendant is given the usual time in which to plead.

MCALVAY, J., concurred with MOORE, J.

OSTRANDER, J. It is clear, I think, that the alleged slanderous words were not spoken of and concerning the plaintiff in his professional capacity or character.

Defendant's alleged conduct may have resulted in some pecuniary damage to him in his profession; and so the same language spoken of and concerning one who was a physician, or an engineer, or architect, might result in some injury to professional business. As affecting the question of the actionable quality of the words, without averments of special damage, they were equally injurious, whatever plaintiff's profession or calling may have been.

"The real practical test by which to determine whether special damage must be alleged and proven in order to make out a cause of action for defamation is whether the language is such as necessarily must, or naturally and presumably will, occasion pecuniary damage to the person of whom it is spoken." Newell on Slander & Libel, p. 181.

In *Smedley* v. *Soule*, 125 Mich. 192 (84 N. W. 63), a case in which plaintiff was an attorney at law and in which the trial court instructed the jury that:

"The declaration avers an injury to plaintiff's fame and character as an attorney. * * *. The publication complained of tends, upon the face of it, to the injury of plaintiff in respect to his profession and business"—

It was said by this court that:

"All charges of disreputable or criminal conduct tend to injure every man in his profession, trade, or occupation; but the law does not permit recovery therefor unless the words be spoken of him in regard to such profession, trade, or occupation, and loss is alleged and proved. Every such plaintiff can recover for injury to feelings and damage to his reputation. If he desires to go beyond this, it is a wholesome rule to require him to connect the libelous charge by the proper colloquium with such profession, trade, or occupation, and to allege special damages."

See, also, *Scougale* v. *Sweet,* 124 Mich. 311 (82 N. W. 1061) ; *Line* v. *Spies,* 139 Mich. 484 (102 N. W.

993) ; *Simons* v. *Burnham,* 102 Mich. 189 (60 N. W. 476).

In my opinion, the alleged slanderous words, and especially the allegation that "Mr. Lewis offered to take $200 to lay down as a candidate for the nomination and throw his support to me," as connected and explained in the declaration, charge disreputable and corrupt, if not criminal, conduct, and are clearly calculated to injure a good reputation and to disgrace the one of whom they were spoken.

It is doubtful if the language set out will in all cases support the innuendo connected with it, but the question is not before us for decision.

I agree that the demurrer was properly overruled, but think the statement in the opinion of Mr. Justice MOORE that what was stated "was well calculated to injure plaintiff in his profession and also as a candidate for the office which he sought" is itself calculated to mislead the trial court with respect to the damages recoverable under the declaration.

STEERE, C. J., and BROOKE, KUHN, STONE, and BIRD, JJ., concurred with OSTRANDER, J.